THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALFREDO GONZALEZ, Defendant-Appellant.

First District (1st Division)   No. 1—92—1605

Opinion filed June 30, 1994.—Rehearing denied August 9, 1994.

MANNING, J., dissenting.

Frederick F. Cohn, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michele Grimaldi Stein, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Alfredo Gonzalez was found guilty of the murders of Kevin and Torrence Wiley. Defendant was sentenced to natural life imprisonment in the Illinois Department of Corrections. Defendant now appeals.

The record on appeal indicates the following facts. The State presented Joseph Wiley to testify that his brothers, Kevin and Torrence, were alive prior to the early morning hours of May 25, 1990. At that time, Kevin and Torrence would have been 26 and 27 years old, respectively. Joseph identified his brothers from photographs.

Chicago police officer Luis Montalvo testified that at approximately 1 a.m. on May 25, 1990, he responded to a police call regarding shots fired at Kimball and North Avenue. Officer Montalvo testified that he arrived at the scene between 10 and 15 seconds later. Officer Montalvo stated that he observed two African-American males down on the sidewalk. Officer Montalvo noted that one man was bleeding from the mouth and the back of the head, but both men were alive and gasping for air or quivering. Officer Montalvo called an ambulance, but both men died before the ambulance arrived. According to Officer Montalvo, a paramedic identified a wound that went almost through the body of the man who was not bleeding. Officer Montalvo identified the scene and the victims from photographs.

Chicago police officer John Butler testified that he was an evi-

dence technician involved in the investigation of the two deaths. Officer Butler testified he took a number of photographs of the scene and searched the area for physical evidence. Officer Butler testified that four nine-millimeter cartridge cases were recovered from the scene. The police also recovered a beer can from the area. According to Officer Butler, these items had partial fingerprints that were not suitable for identification.

Officer Butler indicated that another fired bullet was later found in the underwear of one of the victims, who had gunshot wounds to the chest, hip and penis. Officer Butler testified that he inventoried the spent cartridges. Officer Butler also identified a number of views of the crime scene from a series of photographs taken by Butler and his partner. Out of the presence of the jury, the trial court overruled defendant's objections to the publication of a number of the photographs of the crime scene and the victims.

Rosa Bello testified that she had known defendant and a man named Justino Cruz for approximately two years. Bello identified defendant in court. Bello testified that she also knew a man named Jose Maysonet, indicating that he was the father of her son, who was born in 1991. Bello indicated that defendant, Cruz, Maysonet and a man she knew only as "Fro" were members of a street gang known as the Latin Kings.

Bello testified that on May 24, 1990, she was living with Maysonet and her two daughters, neither of whom was sired by Maysonet. Bello indicated that at approximately 11:30 p.m., after her daughters had gone to sleep, three men she called "Lluvia," "Tino" and "Fro" arrived at her house. Bello testified that "Lluvia" was a nickname of defendant. The three men asked to speak to Maysonet. Bello testified that she admitted the three men to her home, but did not overhear the conversation between the three men and Maysonet.

According to Bello, at Maysonet's request, she retrieved something wrapped in a towel and a plastic bag from the bedroom. Bello testified that she gave the bag to defendant, also at Maysonet's request. Bello testified that she saw that the item inside the towel and bag was a gun. Bello further indicated that she saw defendant put bullets into a clip and put the clip into the gun.

Bello testified that she became upset and said something to Maysonet. Bello also testified that defendant rewrapped the gun in the plastic bag and towel and that she gave defendant a second plastic bag to wrap the gun. Bello further indicated that defendant stuck the gun under his "hoodie" at the waist. Bello explained that the "hoodie" was a long black shirt with a hood. Bello testified that the three men and Maysonet then left; Maysonet returned alone after midnight.

Finally, Bello testified that she had been staying at a hotel for several days at the expense of the State's Attorney's office. Bello testified that she was staying at a hotel because someone had tried to run over her and her son while they were on their way to a doctor between 1:30 and 2 p.m. on the Friday before her testimony.

On cross-examination, Bello admitted that she was not going to testify at any trial of Maysonet. Bello also admitted that although she was questioned by the police on May 25, 1990, she did not tell the police anything about defendant until August 23, 1990, when Maysonet was arrested and charged regarding this matter. Bello testified that she knew the gun she had retrieved was a nine-millimeter gun "just by looking at it," but had seen other such guns "only by books."

Justino Cruz testified that he was charged with the murders of Kevin and Torrence Wiley. Cruz indicated that he had reached an agreement with the State that the State would recommend a 22-year sentence in return for his truthful testimony and a guilty plea as to one of the murders. Cruz testified that he understood that the actual sentencing decision would be made by a judge and that the sentence for the murder to which he will plead guilty could range between 20 and 60 years. Cruz also indicated that without the agreement, he could face life imprisonment or the death penalty.

Cruz further testified that he had been convicted of possession of marijuana and was on probation for that offense on May 25, 1990. Cruz indicated that he had been in custody for approximately 15 months when the State first approached him regarding a plea agreement in January 1992. Cruz testified that he initially declined to enter an agreement and that the aforementioned agreement was reached on March 13, 1992.

Cruz testified that defendant was his uncle. Cruz testified that he also knew Maysonet and "Fro," whom he identified as Chris Hernandez. Cruz indicated that he was a member of the Latin Kings and knew defendant, Maysonet and Hernandez to be Latin Kings.

Cruz testified that on May 24, 1990, he was walking toward his girlfriend's home when he saw defendant and Hernandez in a blue Buick. After a brief conversation with Hernandez, Cruz got into the car. The three men drove to Maysonet's house; Cruz testified that defendant stated that they were going "to Juan's house to get a gun." According to Cruz, Hernandez indicated that they needed the gun to "do a drug sale."

Cruz then testified regarding the events that transpired at Maysonet's home; this testimony is substantially similar to the testimony offered by Rosa Bello. Cruz added that defendant initially told Maysonet to get the gun. Cruz recognized the gun as a nine-millimeter

automatic pistol, as he had seen similar guns on the street. Cruz indicated that he and defendant were wearing "hoodies," which Cruz described as hooded sweatshirts.

Cruz testified that he, defendant, Hernandez and Maysonet then left Maysonet's home and drove away in the car. According to Cruz, Maysonet was the driver, defendant was in the front passenger seat, Hernandez sat behind defendant and Cruz sat behind Maysonet. Cruz indicated that defendant took the pistol out of his pants and looked at it while they drove.

Maysonet eventually parked the car in an empty lot. Cruz testified that he, defendant and Hernandez jumped out of the car. According to Cruz, defendant and Hernandez walked toward North Avenue while he stood by the car and looked toward St. Louis and Kimball. Cruz testified that he could also see two African-American men standing on North Avenue by the empty lot. Cruz testified that he could see defendant and Hernandez talking with the other two men; the four men talked for approximately 5 to 10 minutes.

According to Cruz, when he looked again toward St. Louis and Kimball, he heard three or four shots; he heard one or two more shots as he turned to look. Cruz stated that he saw Hernandez and defendant running toward their car. Cruz also saw one of the African-American men on the ground. According to Cruz, when defendant and Hernandez reached the car, defendant said, "Let's get out of here. We just shot two guys." Cruz testified that everyone jumped in the car and drove away.

Cruz further testified that he was brought to the police station by two plainclothes policemen on August 23, 1990. Cruz saw defendant and Maysonet at the station.

On cross-examination, Cruz indicated that he was aware of the possibility that he might receive day-for-day credit for time served and that "good time" may be deducted from any sentence he will receive under his plea agreement. Cruz admitted that on August 24, 1990, he did not tell Assistant State's Attorney Perkaus that defendant had said "I just shot two people." Cruz added that he did convey that information to his lawyer and to police officers whose names he could not remember prior to March 13, 1992.

On redirect examination, Cruz identified a written summary of a statement he gave to an assistant State's Attorney on August 24, 1990. Cruz indicated that his signature appeared on each page and that the document was in the same condition as when he signed it.

In response to further cross-examination, Cruz admitted that the document indicates "that on May 24th of 1990, at about 1:30, Justino, Alfredo, Chris Hernandez and Jose Maysonet went to Jose's house at 1320 South Homan to pick up a gun."

Ernest Warner, a firearms examiner for the Chicago police department crime laboratory, testified the four nine-millimeter cartridges at issue in this case were fired from the same gun and that three fired bullets recovered from the victims were nine millimeter in caliber and fired from the same gun.

Chicago police detective Ernest Halvorsen testified that on March 25, 1992, he obtained an arrest warrant for Christopher Hernandez from Judge Robert Bastone, charging Hernandez with the murder of the Wiley brothers, based on the fact that Cruz had agreed to testify for the State in this case.

Assistant State's Attorney John Perkaus testified that he took Cruz's statement on August 24, 1990. Perkaus identified the statement, which was then published in its entirety to the jury. Cruz's statement is largely similar to his trial testimony. However, the statement does indicate that he, defendant, Hernandez and Maysonet were initially in the car and stopped at Maysonet's home to retrieve the pistol. The statement adds that after parking the car in the vicinity of North and St. Louis, Hernandez and defendant "hooded up, meaning they put the hoods from their sweatshirts on their heads." Cruz indicated that this meant they will rob or shoot someone. Cruz's statement did not indicate that defendant said anything after the shooting.

Defendant testified that he was walking home at approximately 12 a.m. on March 25, 1990, when he saw Maysonet, Hernandez and "Tino," whom he identified as Cruz, driving a blue car. Defendant testified that he asked for a ride home. Defendant got into the car. According to defendant, Maysonet was the driver, Hernandez sat in the passenger seat, Cruz sat behind Hernandez and he sat behind Maysonet. They drove to the alley between St. Louis and Kimball without stopping at Maysonet's home. Defendant indicated that Maysonet had pulled a nine-millimeter gun out from under a seat and put it back by the seat while they were driving. Defendant testified that he never touched the gun.

Defendant indicated that Maysonet, Hernandez and Cruz jumped out of the car, while he remained inside. Defendant stated that Maysonet and Hernandez put their hoodies on, which meant they were going to kill somebody or something. Defendant testified that he saw the others walk toward the lot and disappear. Defendant later heard five or six shots. The others returned to the car and said nothing as they began to drive away. As the car drove past North Avenue, defendant saw two bodies on the side of the street. Defendant testified that he did not know there was a drug deal going down and did not know that the others were going to shoot somebody before they got

out of the car. Defendant indicated that he did not tell the police about the incident because he was afraid that he or his family might be killed.

On cross-examination, defendant admitted that he had been a Latin King since 1977 or 1978.

Following closing arguments and jury instructions, defendant was found guilty of both counts of murder. Although eligible for the death penalty, defendant was sentenced to natural life imprisonment in the Illinois Department of Corrections. Defendant now appeals.

## I

Initially, defendant contends he was denied due process of law because the State improperly bolstered Cruz's credibility in two ways. We address each contention in turn.

## A

First, defendant objects to Detective Halvorsen's testimony that he obtained an arrest warrant for Hernandez from Judge Robert Bastone based on the fact that Cruz had agreed to testify for the State in this case. Defendant maintains that it is improper for a jury to be informed that a judge gave credence to the accusation of a prime witness for the State.

This court has considered similar objections to warrant-related evidence in *People v. Brandon* (1990), 197 Ill. App. 3d 866, 557 N.E.2d 1264, and *People v. Marshall* (1988), 165 Ill. App. 3d 968, 521 N.E.2d 538. In both cases, the objection was deemed to be wholly or partially waived to the extent that the defendants failed to timely object at trial. (*Brandon*, 197 Ill. App. 3d at 879-80, 557 N.E.2d at 1273; *Marshall*, 165 Ill. App. 3d at 977-78, 521 N.E.2d at 544.) In this case, the record does not indicate that defendant objected to Detective Halvorsen's testimony at trial or in his post-trial motion. Consequently, the argument is waived on appeal.

●1 Moreover, even if the argument had been preserved, it would not be persuasive. In *Brandon*, this court suggested in *dicta* that the defendant was not prejudiced where the police officer's testimony indicated only that the judge approved, rather than recommended, charges. (See *Brandon*, 197 Ill. App. 3d at 879-80, 557 N.E.2d at 1273.) In *Marshall*, this court discussed *People v. Garcia* (1982), 109 Ill. App. 3d 142, 440 N.E.2d 269, noting that *Garcia* involved information from an unidentified informant unavailable for cross-examination, whereas *Marshall* involved a police officer who testified at trial. (*Marshall*, 165 Ill. App. 3d at 977-78, 521 N.E.2d at 544.) In this case, the testimony did not indicate that the trial judge recommended a

warrant. Moreover, both Detective Halvorsen and Justino Cruz testified at trial and were subject to cross-examination; the credibility of both could be assessed by the jury.

Furthermore, the Illinois cases cited by defendant, *People v. Santucci* (1962), 24 Ill. 2d 93, 180 N.E.2d 491, and *People v. Finn* (1959), 17 Ill. 2d 614, 162 N.E.2d 354, are not warrant-related evidence cases and therefore are inapposite to this appeal. The Texas cases cited by defendant are not binding on this court and are also factually distinguishable from this appeal. Consequently, defendant has failed to show that the alleged error warrants a reversal of his conviction, given the record on appeal.

## B

Second, defendant contends that Cruz's testimony was improperly bolstered when his prior written statement to the assistant State's Attorney was published to the jury. Defendant failed to raise this issue in his post-trial motion. Thus, the issue is waived on appeal.

•2 Moreover, even if the argument had been preserved, it would not have been persuasive. Generally, a witness' prior consistent statement is not admissible to corroborate the witness' trial testimony. (*People v. Williams* (1991), 147 Ill. 2d 173, 227, 588 N.E.2d 983, 1003.) Even when a witness is impeached by a prior inconsistent statement, a prior consistent statement is not admissible unless it disproves or explains the inconsistency. (*Williams*, 147 Ill. 2d at 227, 588 N.E.2d at 1003.) However, a prior consistent statement may be admitted to rebut a charge of recent fabrication or motive to testify falsely, when the motive did not exist or the effect of the statement could not have been foreseen at the time it was given. See *Williams*, 147 Ill. 2d at 227, 588 N.E.2d at 1003.

For example, in *Williams*, our supreme court faced this issue regarding grand jury testimony given by Paula Gray, the girlfriend of one of the codefendants. (See *Williams*, 147 Ill. 2d at 196, 588 N.E.2d at 989.) During preliminary proceedings, Gray recanted the grand jury testimony and was indicted both for her participation in the crimes at issue and for perjury; Grey was tried simultaneously with several of the codefendants, though a separate jury was impanelled. (*Williams*, 147 Ill. 2d at 197-98, 588 N.E.2d at 990.) At trial, Gray gave testimony consistent with her grand jury testimony and was cross-examined about her testimony at the preliminary proceedings and whether her testimony was given in hopes of leniency; the transcript of the grand jury testimony was later introduced by the State. (*Williams*, 147 Ill. 2d at 204-07, 588 N.E.2d at 994.) The supreme court held that it was not error to admit the grand jury

testimony, given the defense attempt to imply that the trial testimony was motivated by expectations of leniency and was of recent fabrication. *Williams,* 147 Ill. 2d at 227-28, 588 N.E.2d at 1003.

In this case, the record shows that defendant cross-examined Cruz regarding the fact that Cruz agreed to testify a mere two weeks before trial. The record also shows that defendant used Cruz's prior statement during re-cross to show that it differed from Cruz's trial testimony regarding Maysonet. Given this record, it appears that the trial court acted within the scope of *Williams.*

Defendant argues that the "rebuttal exception" should not apply in this case, contending that Cruz had a motive to testify falsely when he gave the prior consistent statement. However, the supreme court rejected a similar argument in *Williams.* (See *Williams,* 147 Ill. 2d at 227-28, 588 N.E.2d at 1003.) While Gray was not a codefendant at the time she gave her prior consistent statement, as Cruz was here, Gray was interviewed by the police at her home and later went to the police station, where she was interviewed at length. (*Williams,* 147 Ill. 2d at 196, 588 N.E.2d at 989.) The situation here is not so dissimilar as to remove it from the scope of *Williams.* The prior consistent statement is admitted to rebut the charge of *recent* fabrication, *i.e.,* that the trial testimony was fabricated because of the plea agreement reached two weeks before trial.

•3 Defendant also claims that it was error for the State to claim during closing argument that Cruz's written statement enhanced his credibility. However, a review of the record indicates that the State referred to Cruz's statement in closing argument to rebut the charge of recent fabrication before arguing that Cruz's testimony was consistent with the other evidence introduced at trial. Thus, it does not appear that the State unfairly prejudiced defendant in this regard.

In sum, neither the admission of Detective Halvorsen's warrant-related testimony and Cruz's prior written statement, nor the closing argument regarding the latter requires a reversal of defendant's conviction, given the record on appeal.

## II

Defendant contends that the trial court erred in admitting a number of "close-up" photographs of the decedents into evidence. Defendant's brief cites only one such objection. Consequently, defendant's objections to other photographs could be deemed waived. However, in the interest of justice, we address the photographs cumulatively, given the circumstances of this appeal.

•4 The decision to allow a jury to view photographs of a decedent

rests within the sound discretion of the trial judge. (*People v. Henderson* (1990), 142 Ill. 2d 258, 319, 568 N.E.2d 1234, 1263.) Such photographs are admissible if they are relevant to prove facts at issue, so long as they are not so prejudicial and inflammatory that their probativeness is outweighed. (*Henderson*, 142 Ill. 2d at 319, 568 N.E.2d at 1263.) Such photographs may be relevant to prove the nature and extent of injuries and the force required to inflict them; to show the position, condition and location of the body; to show the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness. (*Henderson*, 142 Ill. 2d at 319-20, 568 N.E.2d at 1263-64.) Indeed, where photographs may aid the jury in understanding testimony, they may be admitted despite the fact that they may be somewhat cumulative of that testimony. *Henderson*, 142 Ill. 2d at 320, 568 N.E.2d at 1264.

●5 In this case, the record contains testimony about the nature of the wounds and the cause of death of the decedents. The record indicates that defendant objected to all of the photographs that tended to show in detail the injuries inflicted upon the decedents. The photographs to which defendant objected were both grisly and cumulative of the testimony in this case. For example, it is difficult to understand how a photograph showing the gunshot wound to a victim's penis explains the testimony describing the wound. While the State's argument that the exclusion of photographs depicting a brutal crime may render a trial antiseptic and prevent the State from conveying the degree of brutality involved in a crime is not without merit, we conclude that the photographs in this particular case were clearly more inflammatory than probative of any fact or issue in this case.

Nevertheless, the improper introduction of these photographs does not automatically require this court to reverse and remand the case for a new trial, even when the conviction rests largely on the testimony of one in the position of an accomplice or codefendant. (See, *e.g.*, *People v. Peterson* (1988), 171 Ill. App. 3d 730, 525 N.E.2d 946.) In this case, as in *Peterson*, we conclude that the photographs were not so inflammatory that their admission requires a reversal of defendant's conviction.

### III

Defendant argues that he was denied a fair trial because the State introduced allegedly irrelevant evidence of gang membership and made closing arguments based on that evidence. It is undisputed that the State elicited testimony from Bello and Cruz that defendant,

Cruz, Hernandez and Maysonet were members of the Latin Kings. The record shows that defense counsel also elicited testimony from defendant that defendant was a Latin King in May 1990, there were thousands of Latin Kings at that time and defendant had been a Latin King for about 10 years. On cross-examination of defendant, the State established defendant had been a Latin King for approximately 14 or 15 years in May 1990. The record also indicates, however, that defendant failed to object to almost every instance where gang-related testimony was introduced; the sole objection cited by defendant was made to a question asking whether defendant had been a Latin King since Cruz was nine years old. The record further shows that defendant did not specifically object to the above testimony in his post-trial motion. Given this record, the issue is waived. Nevertheless, the introduction and argument of such evidence may constitute plain error in certain cases. (*People v. Smith* (1990), 141 Ill. 2d 40, 54, 565 N.E.2d 900, 905.) Thus, we address the issue in full.

Although street gangs are generally looked upon with disfavor by society, gang-related evidence will not necessarily be excluded if it is otherwise admissible and relevant. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 489, 568 N.E.2d 864, 867.) Evidence is relevant where it tends to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without that evidence. (*Gonzalez*, 142 Ill. 2d at 487-88, 568 N.E.2d at 867.) For example, gang-related evidence may be relevant to show common purpose or design, a motive for an otherwise inexplicable act, reliability of an identification or the events leading to a defendant's identification and arrest. (*Gonzalez*, 142 Ill. 2d at 488, 568 N.E.2d at 867; *Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.) However, there must be sufficient proof that the gang membership or activity is related to the crime charged. (*Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.) If the evidence is relevant, it may be admitted where its probative value outweighs its prejudicial impact; a trial court's decision to admit such evidence will not be reversed absent a clear abuse of discretion. *Gonzalez*, 142 Ill. 2d at 489, 568 N.E.2d at 868.

●6 In this case, the evidence was admissible to show a common purpose or design. Though Cruz and defendant disagreed as to who shot the decedents, both testified that two of the men from the Buick pulled up their "hoodies" as they went to meet the decedents. Cruz testified that this signified that a drug sale or a "stick-up" was to occur; defendant testified that it signified that somebody or something was going to be killed. Neither Cruz nor defendant would be in a position to give this testimony unless he had knowledge of the practices

of Latin Kings and the persons pulling up their "hoodies" were members of the Latin Kings. That the two men pulled up their "hoodies" made it more probable that the two men shared a common purpose of robbery or murder or both.

In addition, it should be noted that while evidence that defendant was a Latin King may have been prejudicial to his case, evidence that Cruz was a Latin King may have created a similar prejudice against Cruz in the minds of the jury, thereby lessening the relative impact of such evidence as to defendant. Thus, the trial court did not abuse its discretion or commit plain error in admitting the evidence.

## IV

Defendant contends that the introduction of inadmissible hearsay testimony deprived him of due process of law and his sixth amendment right to confront his accusers. The testimony to which defendant objects is testimony of Detective Guevara that after speaking to Maysonet, Detective Guevara, another detective and Maysonet went to locate defendant and Hernandez. Detective Guevara testified that Maysonet "directed" them to three locations; defendant's objection to testimony that Maysonet said "This is where Fro lives" was sustained.

A police officer may testify regarding his or her investigatory procedure, including the existence of conversations, even if the logical inference may be that the officer acted as a result of the conversations, without violating the hearsay rule. (*People v. Jones* (1992), 153 Ill. 2d 155, 159-60, 606 N.E.2d 1145, 1147.) A defendant's right to confront his or her accuser is fundamental, but testimony that implies that the police went to a particular location to look for a defendant as a result of a conversation does not necessarily violate that right. See *People v. Gacho* (1988), 122 Ill. 2d 221, 247-48, 522 N.E.2d 1146, 1159.

●7 In this case, defendant's objection to the substance of the conversation was sustained. Moreover, the statement to which defendant objected concerned Hernandez, not defendant. The jury therefore was merely informed that Maysonet directed the police in a search for defendant and Hernandez after the police spoke to Maysonet. Given the record on appeal, this case falls within the scope of *Gacho*.

## V

Defendant next claims that he was denied due process by the introduction of Bello's testimony that someone had attempted to run over her with an automobile shortly before trial. Defendant believes that he suffered unfair prejudice because there was no evidence that

he was connected to the incident. Defendant did not object to this testimony at trial. Thus, the claim is waived on appeal.

●8 Moreover, even if the argument had been preserved, it would not have been persuasive. The record shows that the State chose to anticipatorily impeach Bello regarding monies she received from the State to stay in a hotel prior to her testimony. A similar situation was presented in the *Williams* case discussed above; a witness testified about monies received for relocation and testified that his request for relocation was due to fear for his family. Our supreme court held that the testimony and argument thereon were not reversible error, despite the fact that the witness did not link his fears to the defendant. (*Williams*, 147 Ill. 2d at 223-25, 588 N.E.2d at 1002.) This case differs from *Williams* insofar as the State questioned Bello regarding the incident, whereas the witness' testimony in *Williams* regarding his concern for his family did not mention any specific incident. However, it must be noted that the trial judge in *Williams* understood the witness' testimony concerned "being threatened." (*Williams*, 147 Ill. 2d at 222, 588 N.E.2d at 1001.) Moreover, as in *Williams*, the disputed testimony was brief. (See *Williams*, 147 Ill. 2d at 225, 588 N.E.2d at 1002.) Thus, the testimony does not warrant a reversal in this case.

## VI

Defendant argues that the State deprived him of due process of law by improperly implying that defendant was a drug dealer who had been involved in prior drug deals. The record shows that the State asked Cruz whether defendant had ever been involved in a drug sale; defendant's objection was sustained and no answer was given. The record also shows that the jury was properly instructed to disregard questions to which objections were sustained.

●9 Generally, where a defendant's objection is sustained and the jury is properly instructed to disregard the question, any potential error is deemed cured. (*Jones*, 153 Ill. 2d at 161, 606 N.E.2d at 1147.) The State may unfairly prejudice by repeatedly attempting to introduce improper evidence or argue unfounded allegations to a jury despite the trial judge sustaining the defendant's objections. (*E.g., People v. Campbell* (1983), 115 Ill. App. 3d 631, 637, 450 N.E.2d 1318, 1322.) In this case, the record does not show that the State attempted to pursue and rely upon objectionable testimony despite the ruling of the trial judge. Consequently, defendant has failed to show that his conviction should be reversed in this instance.

## VII

Defendant argues that his conviction must be reversed due to the cumulative impact of the errors alleged above. However, as defendant has shown only that the admission of gruesome photographs was improper, we must conclude that the argument must fail in this case.

## VIII

Finally, defendant claims that the failure of his trial counsel to object to the errors alleged above in sections I, III, IV and V demonstrates that he was deprived of his right to effective assistance of counsel. Generally, in order to show ineffective assistance of counsel, a defendant must establish that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the outcome would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) If a claim of ineffective assistance of counsel may be disposed of on the ground that defendant did not suffer sufficient prejudice, this court is not required to decide whether the representation fell below an objective standard of reasonableness. *People v. Eddmonds* (1991), 143 Ill. 2d 501, 512, 578 N.E.2d 952, 956.

●10 As noted above, the admission of warrant-related testimony, Cruz's prior consistent statement, gang-related testimony, Bello's testimony regarding her relocation and testimony that Maysonet directed the police to defendant and Hernandez does not constitute reversible error, either separately or cumulatively. Thus, defendant did not suffer sufficient prejudice to require this court to decide whether the representation fell below an objective standard of reasonableness.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'CONNOR, J., concurs.

JUSTICE MANNING, dissenting:

I must respectfully dissent from the majority's affirmance of defendant's conviction in this case. My disagreement with the result stems from the admission into evidence of certain photographs which defendant contends, and I agree, are extremely prejudicial and outweigh any possible probative value. I would hold that the trial

court abused its discretion in admitting the photographs into evidence and publishing them to the jury.

When evidence is received which is totally irrelevant to the issues before the court, we must cautiously determine the prejudicial effect of such evidence. While the majority readily acknowledges the immateriality of the photographs in question and the inflammatory nature thereof, and it concedes that the State's star witness was in the position of an accomplice or codefendant, it then proceeds, nevertheless, to affirm the admission of the photographs by concluding that their admission does not require a reversal of defendant's conviction, citing *People v. Peterson* (1988), 171 Ill. App. 3d 730, 736, 525 N.E.2d 946.

It is my view that the admission of these photographs denied defendant due process. The crucial difference between this case and the *Peterson* case hinges on the *Peterson* court's characterization of the evidence. It stated that "in the face of the overwhelming evidence against defendant, we cannot conclude that the admission of the photographs constituted reversible error." (171 Ill. App. 3d at 737.) In the instant case, there is no overwhelming evidence. There is a major State witness whose status is that of an accomplice or codefendant. The photographs to which the defendant objected, as the majority so aptly points out, were both grisly and cumulative of the testimony presented by the State. However, there was no issue before the court contesting the nature or extent of injuries, nor was there any issue challenging the testimony of the pathologist or of any other witness. The majority further points out, as an example of the inflammatory nature of the photographs, the one photograph which depicted a gunshot wound to a victim's penis, and indeed, questions how such a photograph explains the testimony describing the wound.

Other examples of the inflammatory nature of the scenes depicted in the subject photographs include the front view of a torso of a person lying on the sidewalk, with his shirt raised up to disclose an apparent bullet hole under his left breast and what appears to be blood; the body of a person lying on the sidewalk, with a stream of what appears to be blood on the pavement originating from the head and flowing from the mouth and nose; a person, similar to the above described photograph, but in closer view, from just below the waist up, showing graphically what appears to be a river of blood on the pavement streaming from the face and mouth; a head only view showing what appears to be severe scalp injuries, and what appears to be blood all over the ear and scalp, and coming from the mouth and nose as well; a photograph of what appears to be a staged scene of the victim's pelvic/pubic area, with the shirt raised and the pants pulled down, with what appears to be a rubber-gloved hand holding

up the victim's injured penis, which appears to have sustained a slash/tear injury, against a backdrop of a white object which has the effect of more graphically depicting the injury, and showing apparent blood around the pelvic/pubic area; and finally, another scene which appears to be staged, depicting rubber-gloved hands holding down the victim's pants to reveal what appears to be a bullet hole in the lower torso area, in the area of the belt-band on the pants.

Many of these photographs appear to be staged, totally irrelevant to any issues before the court and, because of their grisly nature, inflammatory and prejudicial. The State contends that the defendant has waived any objections since he did not specify each and every instance of alleged error. I agree with the majority that, in the interest of justice, this issue must be addressed, given the circumstances of this appeal.

While the decision to allow a jury to view photographs of a decedent rests within the sound discretion of the trial judge *(People v. Henderson* (1990), 142 Ill. 2d 258, 319, 568 N.E.2d 1234, 1263), I would hold that the trial court abused such discretion in the case at bar as the photographs are extremely prejudicial and inflammatory and outweigh their probative value. (See, *e.g., People v. Lefler* (1967), 38 Ill. 2d 216, 221, 230 N.E.2d 827.) Additionally, this case does not present overwhelming evidence of defendant's guilt.

For the foregoing reasons, I would reverse and remand this case for a new trial.