THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANCISCO AGUIRRE, Defendant-Appellant.

Second District   No. 2—96—0214

Opinion filed September 16, 1997.—Rehearing denied October 16, 1997.

DOYLE, J., dissenting.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Robert E. Davison, of DePaepe & Davison, of Springfield, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Gary K. Chan, of Chicago, for the People.

JUSTICE COLWELL delivered the opinion of the court:

Following a jury trial, defendant, Francisco Aguirre, was convicted of the unlawful use of a weapon by a felon (720 ILCS 5/24—1.1(a) (West 1994)). The trial court sentenced defendant to eight years' imprisonment. On appeal, defendant contends that prosecutorial misconduct deprived him of a fair trial.

At trial, Detective Scott Chastain, of the Waukegan police department, testified that he and Detective Jay Tapia were in plain clothes, patrolling in an unmarked car, a red Grand Prix. Around 3 p.m., Chastain, who was not driving, saw a white vehicle speeding through a residential neighborhood. The officers pursued the vehicle, and Chastain saw it run a stop sign as it turned right onto Brookside. There were three men in the car. While the officers followed the car, Chastain noticed the backseat passenger and the people in the front of the car turning around and looking at the police. When the officers' car caught up with the white car, the front seat passenger leaned out of the car and tossed something out. According to Chastain, the passenger "appeared to be leaning out of the vehicle with his upper body, took his arm, bent it, and threw his arm out of the window releasing an object from his hand." The object, a gun, separated from the bandanna in which it was thrown. The gun landed in the parkway, and the bandanna fell to the ground in the street. Chastain

then activated the Mars light on the dashboard. The white car tried to pull to the right in the lane. There was a Pace bus stopped in front of it. The officers' car pulled to the left of the white car, which came back into the normal lane on the left and collided with the police car. The collision occurred on the driver's door of the white car and the nose of the police car. Chastain identified defendant as the front seat passenger. Chastain also identified photos taken at the scene. He stated that the photos accurately depicted the vehicles, the bandanna, and the gun and their respective locations.

On cross-examination, Chastain admitted that, when he first saw the white car, it was in front of the post office on Washington Street. The car turned down Dorchester, and the police car then turned around to follow. When the police car first passed, the white car was stationary; while the police car turned around, the white car left the post office and started down Dorchester. The white car was not yet speeding. Chastain admitted that he did not say in his police report that the white vehicle was travelling at a high rate of speed.

Although Chastain stated that the car was pulling away from the curb when the collision occurred, he admitted that in the photo it appears that the white car's front end is pointed towards the curb. According to Chastain, the gun landed three or four feet from the curb. All three men were arrested.

Detective Tapia testified that, as he and Chastain were driving on Washington, he "observed the subject known to" him, and he also saw a white two-door car. While following that vehicle, Tapia observed that it was speeding down Dorchester. He caught up with the car, and it rolled through the stop sign at Dorchester to make a right turn onto Brookside. Tapia believed that the white car was travelling over 45 miles per hour in the 20-mile-per-hour zone. Once on Brookside, the white car slowed down. Tapia saw the three men in the car looking back at Tapia's car. The man in the backseat was in the middle and slightly behind the driver. Then the front seat passenger leaned towards the window, and a hand holding a bandanna emerged from the window. As the bandanna was thrown, a pistol fell out of it to the ground. Chastain activated the Mars lights, and the white car veered right and came back left quickly, striking the front of Tapia's car.

Following the collision, Tapia confronted the driver of the white car, Juan Morales. Chastain was dealing with the other men. The gun was about 10 to 15 feet away from them, and Tapia covered it with the bandanna.

On cross-examination, Tapia explained that when the gun was thrown he could see, through the back window of the white car,

defendant's "head and shoulder area slightly," and, when the gun was released, he could see the right hand coming out of the window. Tapia admitted that the white car was outside the post office when he first saw it. He also admitted that he was guessing that the white car was going 45 miles per hour on Dorchester. Although Tapia covered the gun with the bandanna, the photos taken by the evidence technician show the bandanna lying in the street. Tapia explained that the evidence had been moved before the technician took the photos. Tapia denied that the collision occurred because he drove his vehicle into the white car. After looking at the photos, Tapia stated that his vehicle was not "angled into" the white car but, rather, that the white car was "angled into" Tapia's vehicle.

The evidence technician testified that he was unable to lift any fingerprints off the .22-caliber semi-automatic handgun. There was a bullet in the gun, it appeared that it had been fired, and there were eight rounds in the clip. Other than its slide not working properly, the gun was in good condition. The serial number had been filed off.

For the defense, Juan Morales testified that he went to the post office with defendant, his cousin. Morales was driving, and he waited in the car while defendant went inside. Morales saw Jorge Serrano, whom he knew through Morales' girlfriend. Morales and Serrano went on double dates because Serrano's girlfriend was Morales' girlfriend's best friend. Morales had known Serrano for over six months. Serrano was talking with defendant, and the two got into the car. Serrano sat in the backseat. Morales drove off and turned down Dorchester. According to Morales, he was driving about 25 or 30 miles per hour on Dorchester, and he did not notice any vehicle following him. He stopped at the stop sign and turned right on Brookside, after which he saw an unmarked police car behind him. Serrano began jumping up and down, hysterically asking what he should do. Morales told him to calm down. The police car was flashing its light and Morales went to pull over. Morales looked back and saw Serrano "fling his arm out the window." Defendant did not throw anything out of the vehicle, and he was calm. According to Morales, the police car hit his vehicle.

Despite a motion *in limine* ruling that barred any reference to gang activity, on cross-examination, the prosecutor asked Morales if he remembered what Tapia was wearing that day, and Morales answered, "Gang Unit uniform." Morales explained that, in addition to being his cousin, defendant is a very good friend. Although Morales was arrested, his case was dismissed. Morales further explained that Serrano encountered defendant as defendant was coming out of the post office.

Serrano, who testified through an interpreter, stated that he was walking towards the train station when he saw defendant and Morales. He asked them for a ride. Serrano knew defendant "a little," but he had known Morales for about three months through their girlfriends. Serrano and defendant worked together, and he had first met defendant a month before. Serrano sat in the backseat, Morales was driving, and defendant was the front seat passenger. While they were driving, Serrano saw a police car behind them with its light flashing. Serrano did not know what to do because he had a gun. Serrano testified that it was a .25-caliber semi-automatic, but he identified the gun in court as his gun. He also identified the bandanna as the one he found in the car. He had the gun in his pocket when he got into the car, and he did not tell defendant or Morales that he had a gun. Serrano waited until the police car got close, and then he threw the gun out the window. After the collision, all three were arrested.

Serrano further testified that he got the gun in Chicago. He bought it about a month before the incident, and on the day he was arrested, he told the police that it was his gun.

On cross-examination, Serrano stated that after he bought the gun he left it for a few days with his friend who lives in Chicago. Serrano did not look for serial numbers on the gun and did not file serial numbers off the gun. Serrano is not a United States citizen, and he had never applied for a firearm owner's identification card. The prosecutor asked Serrano what he did after defendant told him the police were coming. The court sustained an objection on the ground that the question assumed a fact. Serrano also explained that as he was walking to the train he saw Morales sitting in a car by the post office. Serrano said hello and asked for a ride. Then defendant came out of the post office. Serrano stated that on the day of the incident he had been to Chicago to take the gun to Crystal Lake. He and two friends had gone to Waukegan to eat lunch, and then Serrano was going to take the train. The gun was loaded, but Serrano did not load it and he did not know how many bullets it held. Serrano denied that defendant threw the gun. Serrano had never been convicted of a felony.

The following colloquy then ensued:

"BY MS. MOE [Assistant State's Attorney]:

Q. But you told the police, you yourself said to the police, 'It's my gun,' is that correct?

A. Yes.

Q. And you are willing to suffer any consequences for that statement, is that correct?

A. Yes.

Q. Now, you are very good friends with Frankie, the defendant at the table?

A. No. I hardly know him.

Q. You hardly know him. But you are willing to take the fall for this, is that right?"

Defense counsel objected to this question, and the court sustained the objection.

Serrano admitted that he talked with defense counsel once about testifying and he spoke with Morales that morning and discussed their girlfriends. On redirect, Serrano testified that on the day of the incident he told the police that he threw the gun. When Morales, defendant, and Serrano were arrested, they were put in separate cells, and when he was taken out of the cell, Serrano told a Spanish-speaking police officer about the gun. On re-cross-examination, Serrano admitted that the case against him was dismissed.

Defendant testified that he went to the post office with Morales. When he came out he saw Morales talking with Serrano. He was not friends with Serrano, but only knew him from work. According to defendant, Morales drove the car, and it "got rammed off the road." While they were driving, defendant noticed that Serrano began "acting crazy" and nervous. Morales and Serrano told defendant that the police were behind them. All three looked back, but Serrano kept turning around. Then, Serrano threw something out the window. Defendant denied that he knew Serrano had a gun, and defendant also denied that he threw the gun out the window.

The prosecutor began her cross-examination with the following question: "Did you come up with the story that we heard today or did Mr. Potkonjak [defense counsel] come up with the story that we heard today?" The court sustained defense counsel's objection and ordered the prosecutor back to her table. The court then stated:

"The jury will disregard that comment of Ms. Moe. It was totally inappropriate. It has no place in the trial. It doesn't help the trier of fact and it is not the right kind of question to ask. So I will ask you to totally disregard that question.

I will ask Ms. Moe not to ask that type of question any more. I am sure she won't."

Defendant denied that he had seen the gun before or ever loaded it. The prosecutor and defendant then engaged in the following colloquy:

"Q. You have seen the serial mark that is filed off?

A. No.

Q. Sure you have.

MR. POTKONJAK: Judge, I object.

THE COURT: Ms. Moe, what was that 'Sure you have'? What was that supposed to be? You want to get on the stand and testify?

MS. MOE: I will withdraw it.

\* \* \*

THE COURT: Ms. Moe step back to the table.

The jury will disregard that last comment of Ms. Moe. It is not evidence, it is not appropriate, not the proper thing for a lawyer to do in this case or any other case. I apologize to the jury an attorney in my courtroom would make two comments like that in a row. The third one we will ask you jurors to leave and we will handle it differently. Thank you for disregarding that last comment."

Cross-examination continued with defendant denying that he had held the bandanna before or that he wrapped the gun in it and leaned out the window and threw it. The prosecutor also asked defendant, "at what point was the light flashing, before or after you threw the gun out the window?" Cross-examination concluded with questions about whether defendant talked with Serrano and Morales about their testimony.

In her closing argument, the prosecutor repeatedly referred to defendant and his "two friends." In rebuttal, the prosecutor argued that Morales claimed "he stayed in the car and that \*\*\* Jorge Serrano got out and Jorge Serrano and the defendant here whom Jorge Serrano says he did not really know, that they got out and hugged and had some conversation and they got in the car." Defense counsel objected, and the court responded that it did not recall any evidence that Serrano and defendant hugged, "but the jury will recall the evidence and rely on its own recollection." The prosecutor further argued, "Serrano says yes, he is willing to take the fall for this. He has no felony convictions." Defense counsel's objection was sustained, and the court instructed the jury to disregard the statement. The prosecutor further argued, "We don't know why he would come in and take the fall. We don't need to know. You don't need to know." The trial court sustained the objection as to the terminology.

During deliberations, the jury sent two notes to the judge. One note asked whether the jury could have "the police reports and the statements of the defense witnesses taken on the day of arrest?" Without objection, the court denied the request and instructed the jury to continue deliberations. The second note stated that the jury had been "at ten to two" for three hours and did not think the vote would change.

On appeal, defendant contends that prosecutorial misconduct deprived him of a fair trial. Defendant concedes that he did not object

to or raise in a posttrial motion some of the prosecutor's comments at issue in this appeal. He urges that we not find these points waived (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), but review them as a matter of plain error (see 134 Ill. 2d R. 615(a)).

■ Under the plain error doctrine, a reviewing court may consider an issue when the evidence is closely balanced or the error is so fundamental and of such magnitude that the accused was denied a fair trial. *People v. Lucas*, 151 Ill. 2d 461, 482 (1992). Contrary to the State's assertion, we find this to be a close case, as evidenced by the jury's note requesting the police reports and the witnesses' statements and by the note stating that the jury was split 10 to 2. The case hinged on the credibility of the witnesses, as the two police officers testified that they saw defendant throw the gun out the window, whereas defendant and his two witnesses testified that it was Serrano who threw the gun. Moreover, the police officers' testimony was impeached in that it did not coincide with the photographic evidence and both officers made it sound as if the only reason they followed Morales' car was because it was speeding, but they failed to include that fact in the police report and both admitted that the car was still at the post office when the officers decided to follow it because Tapia recognized "a subject." Finally, on the day of his arrest, Serrano told the police it was his gun. We therefore conclude that, because the evidence was closely balanced, it is proper to invoke the plain error doctrine here.

■ It is error for a prosecutor to ask a defense witness questions presuming facts not in evidence unless the State has evidence to substantiate the questioning. *People v. Enis*, 139 Ill. 2d 264, 297 (1990). "The danger inherent in such questioning is that the jury will ignore the denial and presume the accuracy of the impeaching insinuation contained in the question." *Enis*, 139 Ill. 2d at 297. Improper remarks in closing argument may be reversible error where they substantially prejudice the defendant or serve no purpose other than to inflame the jury. *People v. Terry*, 99 Ill. 2d 508, 517 (1984). It is blatantly improper to suggest that the defense is fabricated, as such accusations serve no purpose other than to prejudice the jury. *People v. Beringer*, 156 Ill. App. 3d 309, 314 (1987). Although the prompt sustaining of a defendant's objection and an instruction to disregard the question generally cure any error, when the State repeatedly attempts to introduce improper evidence or argue unfounded allegations, the defendant may be prejudiced despite the sustaining of the objections. *People v. Gonzalez*, 265 Ill. App. 3d 315, 328 (1994).

We agree with defendant that he was denied a fair trial by the cumulative impact of the prosecutor's conduct. Not only did she sug-

gest that the defense was fabricated, but she also repeatedly asked improper questions that assumed facts not in evidence or were loaded questions. One question was designed to elicit a response indicating that the officers were from the gang crime unit, which was a violation of the *in limine* order. The prosecutor also argued facts that were not in evidence. In particular, the prosecutor suggested during cross-examination that Serrano was "willing to take the fall" for defendant, and, despite the sustaining of an objection to that question, she argued in closing that Serrano was "willing to take the fall" for defendant. As the trial court noted, the prosecutor's behavior was grossly improper and inexcusable. The case depended on the credibility of the witnesses; the officers testified defendant threw the gun, whereas the defense witnesses testified it was Serrano's gun and he threw it. Thus, although the objections to some of the remarks and questions were sustained, the error could not be cured because the flagrancy and the extent of the misconduct tainted the entire trial.

We therefore conclude that, although the evidence was sufficient to support the conviction, defendant is entitled to a new trial because of prosecutorial misconduct.

The judgment of the circuit court of Lake County is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

RATHJE, J., concurs.

JUSTICE DOYLE, dissenting:
I respectfully disagree that the prosecutor's misconduct warrants a reversal of the conviction.

I agree with our majority that the prosecutor, perhaps through inexperience, committed several infractions that would have been avoided by a competent professional. Probably, the most blatant example is the prosecutor's direct implication that defense counsel had concocted false testimony for defendant. Although it might be appropriate for counsel to argue that his or her opponent's case is a fabrication, when such argument is based upon a reasonable interpretation of the evidence, it is plainly improper to suggest, without clear proof, that counsel has actively fabricated a defense theory or suborned perjury. See *People v. Kidd*, 147 Ill. 2d 510, 542 (1992).

In my view, however, our central focus in reviewing the conviction should be on determining whether defendant's fundamental right to a fair trial has been compromised by the offending practices rather than on penalizing the State for the practices.

Had the trial court failed to deal effectively with the misconduct, I might agree that a new trial would be necessary. However, it appears to me that the judge was, at all times, in firm control of any potential infirmities. He consistently sustained defense objections to the cited infractions and, on at least two occasions, sternly reprimanded the prosecutor in the presence of the jury. Although prejudice cannot always be remedied by a court's rulings, I believe that the trial court's strong intervention, here, more than offset any tactical advantage the prosecutor might have hoped to gain through her misguided approach.

Considering the proceedings in their entirety, it is my opinion that the cited instances of prosecutorial misconduct did not create such prejudice as to inhibit materially defendant's right to a fair trial. Accordingly, I would affirm the judgment of the circuit court.