2020 IL App (1st) 172828-U

THIRD DIVISION
September 30, 2020

No. 1-17-2828

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 11789 |
| | ) | |
| PHILLIP CALABRESE, | ) | Honorable |
| | ) | Earl B. Hoffenberg, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1   *Held*:  The judgment of the circuit court of Cook County is affirmed with the exception that defendant's conviction for criminal damage to property is reduced from a Class 4 felony to a Class A misdemeanor where the State failed to allege damages in excess of $300.  The trial court did not abuse its discretion by allowing evidence of the existence of an order of protection against defendant; defendant's claims of prosecutorial misconduct were not preserved for appeal nor are they subject to plain error review; and the one-act, one-crime doctrine does not apply where defendant's conviction for arson and criminal damage to property stem from two separate acts.

¶ 2   Following a jury trial, defendant was convicted of arson and criminal damage to property stemming from a fire inside his rented storage unit and two electrical boxes within the storage facility for which he was sentenced to a two-year term of probation.  Defendant appeals arguing the trial court erred in allowing the State to introduce evidence of an order of protection obtained

by his now ex-spouse in their divorce proceeding and by allowing the State to engage in certain acts of prosecutorial misconduct. Defendant further argues that the combination of these alleged errors warrants a new trial. Alternatively, defendant argues his conviction for criminal damage to property should be vacated under the one-act, one-crime doctrine or, if not vacated, his conviction for criminal damage to property should be reduced from a felony to a misdemeanor. For the reasons set forth below, we reduce defendant's conviction for criminal damage to property from a Class 4 felony to a Class A misdemeanor and affirm the balance of the trial court's judgment.

¶ 3                                    BACKGROUND

¶ 4                                 Pretrial Proceedings

¶ 5     Defendant, Phillip Calabrese, was charged with burglary, criminal damage to property, and multiple counts of arson[1] stemming from events which transpired on June 23, 2015 and into the early morning hours the following day culminating in a fire inside his rented storage unit containing defendant's personal property and damage to two electrical boxes located within the storage facility. With respect to the criminal damage to property charge, the State alleged defendant knowingly and without consent damaged an entrance door and various attached items and systems which damage exceeded $300 but did not exceed $10,000. Following a jury trial, defendant was found not guilty of burglary and guilty of arson and criminal damage to property. Defendant was subsequently sentenced to a two-year term of probation.

---

[1] The State proceeded on one count of arson and entered *nolle prosequi* for the remaining counts.

¶ 6     The State's theory of the case was that defendant sought revenge against his then-wife, Grace Calabrese, resulting from their acrimonious divorce wherein Grace obtained an order of protection against defendant. While raising no objection to evidence of the 2014 and 2015 divorce proceedings, prior to trial, defendant moved *in limine* to bar the State from introducing evidence of the order of protection obtained by Grace against defendant arguing this evidence was overly prejudicial in that it would invite the jury to speculate as to whether defendant was violent. Following argument, the trial court ruled the State would be permitted to present evidence of the existence of the order of protection but precluded evidence concerning the underlying facts. In its reasoning, the trial court stated:

> "I think it's totally relevant without going into the basis for what the order of protection was to show *** a course of conduct and it shows the fact, according to what I hear, [defendant is] basically saying I don't know what happened so it shows a course of conduct that he was involved in.
>
> I don't see it as a problem. I don't want you to go into what led to the order of protection because that's irrelevant."

The trial court disagreed with defense counsel that even the existence of the order of protection would lead the jury to presume defendant had a violent nature explaining,

> "I don't agree with you on that. *** I will make it clear that the purpose of allowing that is not to show anything *** which relates to the actual order of protection other than there was an order of protection which then followed up in a natural course.

There's an order of protection. [Grace] then based upon that had to move—without the order, it makes no sense, as far as I'm concerned or to the jury, as to the whole process of what happened."

¶ 7     The trial court further explained its determination that any prejudice to defendant was outweighed by the probative nature of the evidence stating:

"I'm not going to allow the whole issue about what precipitated the order of protection. *** I certainly realize that that could lead to some prejudice, but I think the probative value is very important. It goes to the very nature of motive which is really probative of the course of conduct that [defendant] has committed and the fact that the jury *** may come up with something which is negative. *** no one's going to bring up *** what happened with the order of protection and the background.

I find [the existence of the order of protection] to be very probative. What may be a little prejudice, but I think the probative value *** is much more important than the actual prejudicial effect.

*** at this point I'm going to allow the State to just make reference to *** an order of protection without any mention to anything other than the fact that there was an order of protection. So I'm going to allow the State to go into that."

¶ 8                                    Trial

¶ 9                  Defendant's Dissolution Proceedings

¶ 10    At trial, Grace testified defendant owned his own heating and cooling business. He also owned three vehicles—a silver BMW SUV, primarily driven by Grace; a red Land Rover SUV,

and a motorcycle. In August 2014, Grace filed for divorce. After the filing, she and defendant continued to live in the marital home with their two children.

¶ 11    In October, November 2014, Grace and defendant began discussing the sale of the marital home and this issue was addressed several times in their divorce proceeding because defendant did not want to sell the home and would not agree on a realtor or sale price.

¶ 12    In November 2014, defendant "took [the BMW] away from her" and left her with the "badly damaged" Land Rover.

¶ 13    In December 2014, Grace obtained an order of protection against defendant. She continued to live in the marital home with defendant for approximately five or six days thereafter until he was served with the order of protection whereupon he was removed from the home. However, approximately a week thereafter, the divorce judge allowed defendant to move back into the basement of the home with access to the garage because he had nowhere else to stay. Grace and defendant would have telephone conversations which she described as "friendly" when talking about the children and "unfriendly" when other things were discussed.

¶ 14    Grace testified defendant continued to contact her and during those conversations "most of the time he was angry." The State further questioned Grace about the tone of defendant's voice during these calls. The trial court sustained defense counsel's objection, barring questions about "the general nature of what [defendant] was doing." The State then asked if defendant raised his voice on the phone, and the trial court again sustained defense counsel's objection. The State asked if defendant yelled on the phone to which defense counsel's objection was again sustained. The trial court further explained that this line of questioning was not permissible.

¶ 15    In January 2015, the marital home was listed for sale. In February 2015, Grace and defendant received an offer on the home which was ultimately accepted. The closing was

scheduled for March 6, 2015 but was not finalized because defendant did not remove his belongings from the basement and garage. A second closing scheduled for two weeks later also failed for the same reason. Both closings were addressed by the divorce judge who ultimately awarded Grace exclusive possession of the marital home so she could remove defendant's belongings. On April 1, 2015, Grace attempted to access the marital home; however, she testified defendant had changed the locks. Defendant denied changing the locks on the house but acknowledged changing the lock codes on the advice of his attorney. Grace hired a locksmith and upon touring the home noticed that items from the home were missing such as thermostats, ceiling fans, speakers as well as something related to the water pressure. Defendant denied removing any items from the home.

¶ 16    On April 2, 2016, Grace attempted to access the garage pursuant to a court order directing her to hire a moving company to place defendant's possessions from the garage in storage. The movers she had hired were also present, but they could not access the garage which defendant had locked. Grace filed an emergency motion in the divorce proceedings whereupon she was given exclusive possession of the garage and ordered to move defendant's remaining property.

¶ 17    On April 3, 2015, Grace rented storage unit 108C at Extra Space Storage (ESS) located at 5366 North Northwest Highway in Chicago. She learned that defendant had requested an exterior "drive-up" unit. The following day, the movers were able to access the garage, and defendant's personal property was moved to the ESS storage unit. Grace was present when defendant's belongings were placed in the unit and testified they consisted of "mostly tools" and a couple of radio-controlled helicopters. Grace gave defendant the key to the storage unit and never returned to ESS.

¶ 18    Grace testified that a few years earlier there was a fire in the garage of their marital home. Defendant told Grace a battery had caught on fire.

¶ 19                              ESS Storage Unit Fire and Damages

¶ 20    Victor Rivera testified that he was the manager of ESS in 2015 and rented unit 108C to Grace on April 3, 2015.  He described the layout of ESS.  The building had two garage doors— the entrance bay door on Menard Street and the exit garage on Northwest Highway.  Next to the exit bay door (exit garage) on Northwest Highway there was a "pedestrian door."  There are storage units that line Northwest Highway where the exit garage and pedestrian door are located. Unit 108C was an external unit located two doors north of the exit bay door.  These exterior units could only be accessed from outside the building.  To enter ESS through either the entrance garage or the pedestrian door tenants had to enter a code on a keypad.  Defendant testified the pedestrian door was usually taped so that it could be pushed open without entering a code. Rivera testified he had never seen the pedestrian door taped or manipulated to prevent the door from locking.  Rivera testified the exit garage can only be opened and closed from inside the building by pressing a button inside the smaller of two "electrical boxes" on the south wall next to the door.  The larger of the two boxes contained only wires.  Rivera testified the boxes were kept locked; however, defendant testified the boxes were never locked so he could open the exit just by opening the small box and pressing the open button.

¶ 21    Rivera saw defendant at ESS and told him not to stay there overnight, having earlier observed the red Land Rover on surveillance video parked outside unit 108C overnight.  Rivera testified that when defendant told him there was no place to throw away garbage, he gave defendant the code for the pedestrian door to use after 10 p.m. but said such after-hours access

should only be to use the washroom or throw away garbage. Defendant denied Rivera advised him of any "time constraints" with respect to entering the building.

¶ 22    Defendant testified he owned Calabrese Mechanical, a heating and cooling business. His work required him to own a lot of tools and equipment. He discussed his frame of mind with respect to the divorce proceedings. He stated the order of protection Grace obtained was "structured" to get him out of the marital home and give Grace "exclusive rights" to sell the home which he was "unhappy" about. He was not disgruntled to the point that he would burn his own personal property. He knew his personal possessions were being placed in the storage unit at ESS on April 4, 2015 as ordered by the divorce judge but was unhappy with how his possessions were placed in unit 108C. He was upset with how events unfolded with respect to his property. Defendant testified he would not say he was angry with Grace and was asked a series of questions about his communications with her. That exchange was as follows:

> "State:  In fact, you were very angry with Grace Calabrese, correct?
>
> Defendant:  No, I wouldn't say that.
>
> State:  Well, you called her names, correct?
>
> Defendant:  No, that's not correct.
>
> State:  You called her a 'b***,' correct?
>
> Defendant:  That's not correct.
>
> State:  You sent her angry texts, correct?
>
> Defense Counsel:  Objection.
>
> Defendant:  That's not correct.
>
> Defense Counsel:  There's no evidence.
>
> The Court:  Well, she can ask. He can deny it.

Defense Counsel:  She can't prove it.

The Court:  The objection is overruled.  He denied that."

¶ 23    Defendant testified the contents of the storage unit included many tools, electronics, documents, and clothing which he valued at over $100,000.  He denied there were propane tanks in the unit identifying the tanks in photographs of the storage unit as empty "recovery unit tanks" used to capture non-flammable refrigerant when evacuating an HVAC system.

¶ 24    At approximately 8:15 p.m. on June 23, 2015, defendant went to ESS to get some clothes. He noticed his BMW was overheating and discovered the "reservoir tank" was leaking.  He purchased some epoxy to fix the tank and got some food.  He returned to ESS at about 10:30 p.m. to put his radio-controlled helicopter he had used earlier that day back in the storage unit. He then went back to ESS after 11 p.m. to fix his car in the interior of the building because it was well-lit.

¶ 25    Defendant testified he entered the pedestrian door to ESS without using a code and then opened the small electrical box which was unlocked to open the exit garage.  Defendant backed his car into the bay and began working on the reservoir tank making three trips to his storage unit between 11 p.m. and 11:30 p.m. which he testified was for purposes of retrieving tools.  While in ESS, defendant testified he walked to the area near the electrical boxes because he was using power tools and this is where the electrical outlets were located.

¶ 26    Defendant testified he was surprised by the fire alarm at approximately 12:30 a.m.  He went outside and saw smoke coming from his storage unit.  Defendant ran back to his car to get the keys and returned to the storage unit and opened it to find fire inside.  Defendant believed the fire had been started by the radio-controlled helicopter's "Lipo polymer" batteries which were charging in the unit off a field battery and converter.  He tried to pull out the charger mechanism

in attempt to "disperse" the flames without success. He saw a "TV or something like that" and threw it down on the fire to try to "smash [the fire.]" He was "frantic" at the time and never noticed the fire extinguisher by the pedestrian door.

¶ 27    Defendant testified while he was addressing the fire, he turned and saw a vehicle. He flagged down the driver, Chicago Police Officer Robert Peraino, and motioned him to call 911 because he had forgotten his cellular phone which was charging in his other car. When the firefighters arrived, defendant answered some brief questions about the location of the rear entrance to ESS then opened the exit door and drove away telling an officer present on the scene that he would be back after he got his phone. He drove his BMW to his other vehicle, got his phone, and returned to ESS on his motorcycle because he had not finished the repairs on his BMW and did not want to drive it.

¶ 28    Upon returning to ESS, defendant approached Chicago Fire Marshal James Jenkins who was standing in front of defendant's storage unit. Defendant testified he told Jenkins he believed batteries caused the fire and showed him the helicopter. Jenkins denied that exchanged occurred. Defendant acknowledged the helicopter was not visible in photographs of the storage unit introduced by the State. Defendant testified the two men proceeded to have a cordial conversation about motorcycles and Jenkins' prior injury. Jenkins denied that he and defendant discussed motorcycles.

¶ 29    ESS video surveillance from the night of the incident was played at trial and was partially narrated by Rivera. The video showed defendant parking his BMW outside ESS at 11:12 p.m. on June 23, 2015. Inside ESS, defendant approached the pair of electrical boxes that controlled the exit garage doors which Rivera testified were locked. Defendant walked backed toward the pedestrian door, stopped, pulled something from his pocket, and returned to the electrical boxes.

Defendant reached into the smaller electrical box and the exit garage opened. Defendant then backed his vehicle into the building. Rivera testified he saw defendant on the surveillance video approach the electrical boxes and appeared to be "accessing the box." Rivera testified he inspected the electrical boxes after watching the surveillance video and "[t]hey appeared damaged and broken into. *** One of the locks was actually broken." Rivera acknowledged he did not confirm the boxes were locked before he left work the day before, however, Arson Unit Detective Greg Granadon who inspected the scene, testified he spoke with Rivera who told him the last time he saw the box it was not broken. Defendant denied forcing open either of the electrical boxes on the wall.

¶ 30    Defendant then opened the trunk of his car, took an item, and carried it to the pedestrian door. He is then visible standing in front of his storage unit for about 30 seconds. When he returned inside ESS, his right hand was empty, but his left hand was not visible. Approximately one minute later, defendant exited the pedestrian door with his left hand empty. His right hand was not visible in the video. About 90 seconds later, he entered the building empty handed. Defendant returned to the trunk of his car from which he carried a small item to his storage unit.

¶ 31    Approximately four minutes later, defendant returned to his car where he remained for the next 36 minutes working with various items, moving items around, and at one point bringing the garbage can from the washroom to his car. During part of this time, defendant is in the area near the electrical boxes and can be seen sometimes reaching up to one of the boxes. He is visible at the boxes at 12:08 a.m. when the video suddenly skips ahead to 12:31 a.m.

¶ 32    At 12:22 a.m. defendant is visible returning to his car with several items and appears to use a spray bottle on a large item for several minutes, then carried the item off-screen toward his storage unit. He then spends about a minute carrying black items between his trunk and an area

off screen. At 12:30 a.m., defendant looked back at his storage unit and runs off-screen to the left. About 30 seconds later, he returns to his car, puts items in the trunk and exits the pedestrian door. At 12:30 a.m. smoke from the storage unit becomes visible on the outside camera. Soon after, defendant can be seen walking alongside the building and entering his storage unit.

¶ 33    Defendant is visible at various points standing in front of and around his storage unit before going back into ESS where he can be seen packing up his car, bringing garbage away from his car at a fast pace, and talking with firefighters before ultimately leaving ESS in the BMW.

¶ 34    Officer Peraino testified that on June 24, 2015, he was driving home from work at about midnight past ESS when he observed a fire. He saw defendant throw a large object toward the fire in the storage unit causing the flames to get bigger. This caught Peraino's attention and he made a U-turn and pulled up near the ESS exit garage. He asked defendant if everything was okay and described defendant as "kind of in frantic mode" and kept saying "call 911, call 911." He believed defendant indicated he worked at ESS when Peraino asked but acknowledged that he told an investigator a few months prior to trial he could not recall defendant's response. Defendant denied telling Peraino he worked at ESS. As Peraino was calling 911 he saw defendant throwing another large, box-like object toward the fire. He also saw defendant walking back and forth between the storage unit and the pedestrian door and "aggressively pulling on that door[,]" but did not see him enter the building. Peraino waited for the firetruck to arrive before driving home.

¶ 35    Fire Marshall Jenkins testified as an expert in "fire investigation" qualified to offer an opinion as to the "cause and origin" of a fire. Jenkins arrived at ESS at approximately 1:00 a.m. Defendant approached Jenkins and told him he was inside ESS earlier that night "working on his

car[,]" heard a "boom[,]" and saw fire coming from his unit. Defendant told him he had parked his car at a nearby Walgreens and returned to ESS on his motorcycle. Jenkins never received a responsive explanation from defendant when he asked defendant why his car was parked at the Walgreens. Jenkins testified defendant also told him he was going through a divorce, that "she was responsible for the troubles[,]" "she put all the stuff there and she may have been responsible[.]" Defendant denied talking to Jenkins about his divorce.

¶ 36     Jenkins spoke with Rivera and they reviewed the ESS surveillance footage together. Thereafter, Jenkins examined the storage unit. The only source of electricity in the unit was unscathed. Jenkins concluded the origin of the fire was in the middle of the storage unit near the door and the cause of the fire was an open flame available to combustibles which "were plastics and cardboard, paper known as debris." The source of the flame could have been a match, lighter, or torch. He testified the fire burnt slowly for approximately 45 minutes in the confines of the storage unit. The fire started prior to 12:30 a.m. and took about 10 minutes until it developed to the point where the smoke would be coming out of the storage locker and the alarm would go off. When asked whether a battery being charged by a converter could have started the fire Jenkins responded, "But it has to generate enough heat to sustain heat to create the high electrical temperature, that it's not there." When asked about the situation where lithium batteries were being charged and during the charging process caught fire, Jenkins stated he had heard of those situations but "[t]hat's not one of them." Jenkins found a damaged battery in the unit but concluded it did not start the fire. Jenkins did not see a radio-controlled helicopter in the unit. Because he concluded the fire had been started by an open flame, Jenkins called the Chicago Police Department's arson unit.

¶ 37    Arson Unit Detective Granadon testified he arrived at ESS on June 24, 2015 between 2 and 3 a.m.  Granadon looked at the electrical boxes in the garage bay area and noted "there were two metal boxes on the wall ***, which were control boxes to control the overhead door, and the doors to access them had been, in my opinion, pried open *** you could pull them right up."  A debris sample was tested for the presence of an accelerant which came back inconclusive.  Granadon observed in the unit "propane tanks" which he described as a fire hazard as well as tools which included flammable gas.  He was not familiar with the recovery tanks used in heating and cooling work.

¶ 38    The parties stipulated to State's Exhibit 32 an estimate of the damage to the storage unit and surrounding areas which did not include the electrical boxes next to the exit garage.

¶ 39                                      Closing Argument

¶ 40    During closing argument, the State, in presenting its theory of the case that defendant's actions were an attempt to retaliate against his wife for her actions during their contentious divorce proceedings, stated "When Grace filed for an order of protection against the defendant, the defendant found a way to get back into the house."

¶ 41                       Jury Deliberations and Posttrial Proceedings

¶ 42    Jury deliberations commenced on September 1, 2017 at 12:57 p.m. and lasted approximately five hours.  During that time, the jury sent three notes.  The jury returned a verdict of not guilty of burglary and guilty of arson and criminal damage to property.

¶ 43    Defendant filed a posttrial motion in which he raised several allegations of error including that the trial court erred in "allowing the State to present evidence of the existence of the Order of Protection," as well as evidence concerning the specific facts of the divorce

proceedings and mischaracterizations of those proceedings. The trial court denied defendant's motion.

¶ 44    On September 20, 2017, defendant was sentenced to concurrent two-year terms of probation for arson and criminal damage to property.

¶ 45    This appeal followed.

¶ 46                                    ANALYSIS

¶ 47    On appeal, defendant argues the trial court erred in denying its motion *in limine* to the extent it allowed the State to introduce evidence of the existence of the order of protection obtained by Grace in their divorce proceeding. Defendant also alleges the State engaged in prosecutorial misconduct denying him a fair trial. Defendant further argues that the cumulative effect of these alleged errors necessitate a new trial. Alternatively, defendant argues his conviction for criminal damage to property should be vacated under the one-act, one-crime doctrine and contends that if his conviction for criminal damage to property is not vacated, this conviction should be reduced from a felony to a misdemeanor.

¶ 48    We review a trial court's decisions with respect to the admission of evidence including the denial of a motion *in limine* for an abuse of discretion. *Griffin v. Prairie Dog Limited Partnership*, 2019 IL App (1st) 173070, ¶ 66. "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, unreasonable, or when no reasonable person would take the same view as the trial court." *People v. Morris*, 2013 IL App (1st) 110413, ¶ 47. A reviewing court will find reversable error with respect to claims of prosecutorial misconduct where the defendant demonstrates that the remarks were improper and so prejudicial that real justice was denied or the verdict resulted from the error. *People v. Jackson*, 2020 IL 124112, ¶ 83. Claims of ineffective assistance of counsel not raised in the trial court are reviewed *de novo*. *People v.*

*Bates*, 2018 IL App (4th) 160255, ¶ 46. Arguments alleging a violation of the one-act, one-crime rule are also reviewed *de novo*. *People v. Almond*, 2015 IL 113817, ¶ 47.

¶ 49                                   Motion *in Limine*

¶ 50     We first address defendant's argument the trial court erred in denying his motion *in limine* to bar evidence of the order of protection obtained against him by Grace in their divorce proceeding.

¶ 51     Motions *in limine* are encouraged in criminal cases "to protect the moving party from the prejudicial impact of inadmissible evidence being asked and objected to in the presence of the jury. *People v. Pantoja*, 231 Ill. App. 3d 351, 353 (1992). At the same time, such motions are "characterized as a potent weapon because it enables a party prior to trial to limit or prohibit interrogation by the other party." *Lundell v. Citrano*, 129 Ill. App. 3d 390, 395 (1984).

¶ 52     Illinois Rule of Evidence 401 defines "relevant evidence" as "evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, even relevant evidence which is generally admissible pursuant to Rule 402 (Ill. R. Evid. 402 (eff. Jan. 1, 2011)), "may be excluded [pursuant to Rule 403] if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of *** needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011); see also *People v. Morris*, 2013 IL App (1st) 110413, ¶ 62. Accordingly, when ruling on a motion *in limine*, "the court should balance the prejudice that might be avoided if it grants the motion against the complication or inconvenience that would result if the motion is denied." *Rush v. Hamdy*, 255 Ill. App. 3d 352, 365 (1993). A motion *in limine* is improper where it precludes the introduction of relevant evidence. *Id*.

¶ 53     Here defendant concedes that evidence of the existence of an order of protection was relevant, but contends it was more prejudicial than probative because it left the jury to infer defendant committed an act of domestic violence or threatened to do so.  Defendant also argues evidence of the existence of an order of protection should not have come in "[b]ecause the State was allowed to present so much other evidence to serve the legitimate purpose of showing context or motive such that "the probative value" of the order of protection "was greatly diminished."

¶ 54     In denying defendant's motion *in limine*, the trial court discussed the relevance of the evidence as exhibiting the course of conduct that would explain defendant's motive for setting fire to his possessions in the storage unit.  The court weighed the prejudicial potential of the evidence noting the jury could come up with something negative and diminished this potential by prohibiting evidence concerning the underlying circumstances which led to the entry of the order.  Ultimately the trial court concluded the probative value of the evidence was "very important" such that the potential for "a little prejudice" was outweighed by the "very probative" evidence.

¶ 55     We reject defendant's contention that there was "so much other evidence" to show context or motive.  It is far from unexpected that two individuals in the midst of a divorce would engage in heated conversations involving raised voices and name-calling.

¶ 56     Notwithstanding defendant's argument to the contrary, nothing here suggests the divorce proceedings were so virulent that defendant would engage in criminal conduct involving the intentional destruction of his own property.  However, evidence of this existence of an order of protection helps, in the context of the various other divorce-related incidents relayed at trial, to

illustrate the caustic nature of the divorce proceedings supplying motive that would be consistent with the State's theory of the case.

¶ 57    Defendant points to the trial court's comment that it was "obvious" what was going on and argues this shows the trial court's belief that the State had sufficient evidence of motive without introducing the existence of an order of protection.  Defendant takes the trial court's comments out of context.  The trial court's comments were in response to an objection raised by the defense to a line of questioning concerning the purpose of going to court in the divorce proceedings after defendant interfered with the closing on the marital residence.  The trial court's reference was made with respect to defendant's attempts to frustrate the sale and closing of the marital residence requiring judicial intervention.  Moreover, at that point in the trial, evidence that an order of protection existed had already been introduced to paint a complete picture of how the tumultuous proceedings escalated.

¶ 58    Defendant argues Grace's testimony concerning the existence of the order of protection was cumulative of the other divorce related testimony, and thus, should have been excluded as cumulative evidence.  Defendant contends *People v. Zimmerman*, 2018 IL App (4th) 170695, supports his argument.  We disagree.  In *Zimmerman*, the defendant was indicted by a grand jury for first degree murder of his ex-wife.  *Id*. at ¶ 1.   The State filed a motion *in limine* seeking to introduce certain statements made by the defendant's ex-wife under the doctrine of forfeiture by wrongdoing.  *Id*.  The defendant sought to exclude these statements.  *Id*.  The State's theory was that the defendant killed his ex-wife to prevent her from testifying against him in post-decree divorce proceedings in which the ex-wife sought to recover from the defendant certain childcare expenses which would negatively impact his retirement plans.  *Id*. at ¶ 36.  The State sought to introduce 40 statements from 16 witnesses and approximately 20 documents spanning in time

from the day of the murder to four years prior. *Id*. at ¶ 30. The trial court ruled only three of the ex-wife's statements could be admitted pursuant to the forfeiture by wrongdoing doctrine. *Id*. at ¶ 119. The *Zimmerman* court affirmed the trial court ruling finding no abuse of discretion explaining that allowing some statements of the ex-wife to show motive while prohibiting other statements as being cumulative was reasonable because the probative value of the additional statements, which were all prejudicial, started to decrease due to the cumulative effect of the statements. *Id*. at ¶¶ 120-21. Unlike in *Zimmerman*, here we have no cumulative evidence. While there was some evidence about the divorce, evidence of the order of protection was of a different nature than the other divorce testimony in that it demonstrated defendant and Grace's divorce was different than the ordinary stressful divorce, but a highly contentious and litigious proceeding giving defendant motive to burn his property at ESS as the State theorized.

¶ 59 Additionally, we disagree that any prejudicial impact here was "enormous" as defendant argues. Again, the trial court allowed only evidence that an order of protection existed and prohibited testimony as to the circumstances underlying that order. Further, we find that any inferences the jury might have made about defendant having a violent nature would have been tempered by testimony that Grace and defendant continued to live together in the marital home for nearly a week after the order was issued and that only a week after defendant was required to leave the home due to the order of protection, the divorce judge allowed him to move back in the home with Grace and their children, albeit in separate quarters.

¶ 60 We do not find this case analogous to *People v Emmerson*, 97 Ill. 2d 487, 496-97 (1983), where the trial court barred mention of the fact that the defendant, who was charged with murder, was arrested with a gun in his possession and the State improperly commented on inadmissible facts during argument stating " 'we can't tell you everything [the defendant] did after his arrest

and he knows it. Maybe when this is over I will tell you what he did when he was arrested.' "
*Id.* Here, unlike in *Emmerson*, no inflammatory statements were made concerning the order of protection, and, as discussed above, the evidence was a necessary component of the State's theory of the case. As the trial court explained, "without the order, it makes no sense *** as to the whole process of what happened." Moreover, defendant was not charged with a crime which involved physical violence, let alone a violent crime against Grace as was the case in *People v. Purcell*, 364 Ill. App. 3d 283, (2006), cited by defendant in support of his position that introduction of an order of protection left the jury "free to draw a reasonable inference that [the] defendant abused [his wife]."

¶ 61    Moreover, as the State points out, even evidence of other crimes is admissible to show motive where its prejudicial effect is not substantially outweighed by its probative value. *People v. Dabbs*, 239 Ill. 2d 277, 283-84 (2010). Here we find no abuse of discretion with respect to the trial court's determination that the prejudicial effect of the existence of the order of protection was not substantially outweighed by its probative value.

¶ 62                          Prosecutorial Misconduct

¶ 63    Defendant next argues three instances of prosecutorial misconduct which he contends resulted in a tainted verdict warranting a new trial: (1) a line of questioning during Grace's direct examination about defendant's tone during their communications which the State continued to pursue despite the trial court sustaining defendant's objections; (2) a line of questioning regarding defendant's text communications with Grace and, (3) the State's comment during argument concerning defendant's re-entry into the marital residence after Grace obtained an order of protection requiring defendant to vacate the property.

¶ 64    Though the State, in its responsive brief, indicates that two of these alleged errors were preserved, defendant acknowledges in his brief that none of the alleged acts of prosecutorial misconduct raised on appeal were properly preserved.  To preserve a claim of prosecutorial misconduct for review, a defendant must object to the offending conduct both at trial *and* in a written posttrial motion.  See Ill. R. Evid. 103(b)(4) (eff. Oct. 15, 2015) (In all criminal trials, to preserve an issue for appeal where the trial court has not made a prior ruling, a contemporaneous trial objection or offer of proof must be made *and* that claim of error must be made in a posttrial motion.).

¶ 65    Defendant specifically states in his brief that evidence of the order of protection denied defendant a fair trial "is only made more necessary when this preserved claim [(denial of defendant's motion *in limine* on the order of protection)] is considered alongside *the three unpreserved claims of prosecutorial error*, concerning the prohibited questions to Grace about [defendant's] tone of voice, the prosecutor's introduction of her own testimony concerning the content of [defendant's] messages to Grace, and the prosecutor's insinuation in closing argument that [defendant] acted nefariously when he moved back into his house."  (Emphasis added).  See *Wheeler*, 226 Ill. 2d at 122.

¶ 66    Despite not properly preserving these issues for appeal, defendant argues "[u]nder the standard for prosecutorial misconduct, this Court should remand for new trial because 'the jury could have reached a contrary verdict' absent the improper remarks, regardless of whether counsel objected to each error" quoting a portion of *People v. Wheeler*.  Defendant's characterization of the decision in *Wheeler* to avoid forfeiture where the jury could have reached a contrary verdict despite counsel's failure to properly preserve the issue is incorrect.  *Wheeler* is clear that forfeiture applies in such cases of prosecutorial misconduct.  See *Wheeler*, 226 Ill. 2d

at 122. However, the *Wheeler* court explained that when there are multiple claims of prosecutorial misconduct reviewing courts will review only the preserved errors. *Id*. at 122-23. The court further noted that, in reviewing the preserved errors, closing arguments must still be considered in their entirety and thus, reviewing court's will not treat the other unpreserved statements made by the prosecutor as if they did not exist. *Id*. Accordingly, we must determine whether defendant's unpreserved arguments of prosecutorial misconduct are reviewable under the plain-error doctrine. See *Jackson*, 2020 IL 124112, ¶ 81.

¶ 67                          Plain-Error Doctrine

¶ 68    "The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Glasper*, 234 Ill. 2d 173, 203 (2009) quoting *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Plain error will only be found in exceptional circumstances in which "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." (Internal quotation marks omitted.) *People v. Sharp*, 391 Ill. App. 3d 947, 957-58 (2009). Defendant argues plain error under both prongs.

¶ 69    The burden of persuasion to show plain error under either prong remains with defendant. *Herron*, 215 Ill. 2d at 187. "However, before considering whether the plain-error exception applies, we must first determine whether any error occurred." *Glasper*, 234 Ill. 2d at 203-04. "When a defendant fails to establish plain error, the result is that his procedural default must be honored. [Citation.] In addressing an assertion of plain error, it is appropriate to determine whether reversible error occurred at all. [Citations.]" *Jackson*, 2020 IL 124112, ¶ 81.

¶ 70                          Prosecutorial Misconduct

¶ 71    The parties disagree as to the appropriate standard of review for cases of alleged prosecutorial misconduct.  Defendant cites *People v. Jackson*, 2020 IL 124112, wherein our supreme court stated "The standard of review applied to prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor committed plain error *** [such that] reversable error [will be found] only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error."  *Id*. at ¶ 83.  The State contends the appropriate standard is abuse of discretion citing our supreme court's earlier decision in *People v. Blue*, 189 Ill. 2d 99, 128 (2000).  We agree with defendant that the subsequently decided *Jackson* case sets forth the appropriate standard of review.  See *Bates v. Sandy*, 27 Ill. App. 552, 555 (1888) (holding that where our supreme court cases are in conflict, it is the appellate court's duty to conform to the latest decision).

¶ 72    "Every defendant has the right to a trial free from improper prejudicial comments or argument by the prosecutor."  *People v. Simms*, 192 Ill. 3d 348, 396 (2000).  In *Wheeler*, our supreme court reaffirmed its intolerance of prosecutorial misconduct noting that "a criminal defendant, regardless of guilt or innocence, is entitled to a fair, orderly, and impartial trial.  *Wheeler*, 226 Ill. 2d at 121-22.

¶ 73    "Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right to a fair and impartial trial."  *Simms*, 192 Ill. 3d at 398.

¶ 74     "It is error for a prosecutor to ask defense witness questions presuming facts not in evidence unless the State has evidence to substantiate the questioning."  *People v. Aquirre*, 291 Ill. App. 3d 1028, 1035 (1997).  "[T]he proper procedure upon the sustaining of an objection is

to present the anticipated response by an offer of proof outside the presence of (the) jury—not by continuing the question in a vein held objectionable by the court." (Internal quotation marks omitted). *People v. Weinger*, 101 Ill. App. 3d 857, 871-72 (1981).

¶ 75 Moreover, "Improper remarks during closing argument may be reversible error where they substantially prejudice the defendant or serve no purpose other than to inflame the jury." *Aquirre*, 291 Ill. App. 3d at 1035. That said, a prosecutor is allowed substantial latitude in presenting closing argument and may comment on the evidence and draw all legitimate inferences therefrom even when unfavorable to the defendant. *Simms*, 192 Ill. 2d at 348. Closing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context. *Wheeler*, 226 Ill. 2d at 122. Brief and isolated comments in the context of an entire closing do not deny a defendant a fair trial. *People v. Hayes*, 409 Ill. App. 3d 612, 625 (2011).

¶ 76 The prompt sustaining of a defendant's objection and an instruction to disregard the question will generally cure any error; however, repeated attempts to introduce improper evidence or argue unfounded allegations may still result in prejudice. *Aquirre*, 291 Ill. App. 3d at 1035. Additionally, "The trial court may cure errors by giving the jury proper instructions on the law to be applied; informing the jury that arguments are not themselves evidence and must be disregarded if not supported by the evidence at trial; or sustaining the defendant's objections and instructing the jury to disregard the inappropriate remark." *Simms*, 192 Ill. 2d at 396.

¶ 77 To constitute reversible error, the improper remarks must have resulted in substantial prejudice to the defendant, such that, absent those remarks the verdict would have been different. *Hayes*, 409 Ill. App. 3d at 625. Here we find no reversible error occurred at all as to the alleged prosecutorial misconduct and thus the plain-error exception to forfeiture is inapplicable.

*Jackson*, 2020 IL 124112, ¶ 81; see also *People v. Johnson*, 218 Ill. 2d 125, 139 (2005) (holding "there can be no plain error if there is no error").

¶ 78    We first address defendant's claim with respect to the prosecutor's statement during closing argument that "When Grace filed for an order of protection against the defendant, the defendant found a way to get back into the house." Here we find no error occurred at all. There was evidence introduced at trial that after defendant was removed from the martial residence, he filed an emergency pleading in the divorce case asking that he be permitted to return to the home because he had nowhere else to live. The divorce judge granted defendant's request allowing him to move back into the basement of the home with access to the garage. We disagree with defendant that the State's remark gave the implication that defendant's return "was part of a malicious and illegal effort to control Grace." Instead, the remark was consistent with the evidence and proper given the wide latitude prosecutors are given in presenting closing arguments, commenting on the evidence, and drawing legitimate inferences therefrom. See *Simms*, 192 Ill. 2d at 348. Thus, we find no error occurred at all and, as such, review is not permitted under either prong of the plain error doctrine. See *Jackson*, 2020 IL 124112, ¶ 81.

¶ 79    Defendant also argues the prosecutor improperly continued a line of questioning about the tone of defendant's voice when he spoke to Grace on the phone following the order of protection after defense counsel's objections were sustained as follows:

> "State:  And when you were having—What was the tone of voice the defendant used when having conversations with you during that time?
>
> Grace:  Well, most of the time he was angry.
>
> State:  And was his voice loud or soft?
>
> Defense Counsel: Objection.

Court: Again, sustained as to the general nature of was it loud or soft. If you want to be more specific, I'll let you go into it. But the general nature of what he was doing is not appropriate.

State: Was the defendant's voice raised when he was having conversations with you?

Defense Counsel: Objection, same—[different words.]

Court: Objection sustained.

\* \* \* \*

State: Was the defendant yelling when he had conversations with you?

Defense Counsel: Objection.

Court: Let me make it very clear. This line of question[ing] is not permissible on a general basis. If you want to be more specific, I will allow you to ask the questions. \*\*\* The general nature of the questions is not proper at this time, the specifics are. If you want to get more specific, that's fine. But as long as you want a general attitude of what it is, you have to be—It could have been any time. We don't know what dates we're talking, what times we're talking. So it's just too broad at this time."

¶ 80    Defendant argues this was error for two reasons: (1) "the trial court could not have been more clear that it found the prosecutor's question about the general tone of [defendant's] voice improper" and (2) it was introduced "to insinuate for the jury that the State was aware of evidence harmful to [defendant] that the jury was not being allowed to hear, in order to expand on its theory that [defendant] was something like a ticking time-bomb who was prone to anger."

¶ 81 We agree with defendant that the State's actions in asking versions of the same question two additional times after defendant's timely objection was sustained was improper. See *Weinger*, 101 Ill. App. 3d at 871-72. However, as explained below, we disagree that this line of questioning constitutes reversable error because the remarks were so prejudicial that real justice was denied or the verdict resulted from the error. See *Jackson*, 2020 IL 124112, ¶ 83. Because we find no reversible error occurred, defendant's second unpreserved allegation of error is not subject to plain error review under either prong of the plain error doctrine. See *id*. at ¶ 81. We note that the analysis would be the same regardless of whether the issue was properly preserved. As our supreme court pointed out "The standard of review applied to a prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor committed plain error." *Id*. at ¶ 83.

¶ 82 To begin, the trial court sustained each of defendant's objections and explained that the State's questions were improper in that they lacked foundation. After sustaining defense counsel's third objection the court explained that the State's line of questioning was improper. The trial court specifically stated, "Let me make it very clear. This line of question[ing] is not permissible on a general basis[.]" Additionally, prior to deliberations, the trial court instructed the jury to disregard questions to which objections were sustained and explained that "The evidence which you should consider consists only of the testimony of the witnesses and the exhibits and stipulations which the Court has received." As the State points out, unless there is evidence to suggest otherwise, which we note is not the case here, the jury is presumed to follow the trial court's instructions. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Thus, we find the trial court cured any error. See *Simms*, 192 Ill. 2d at 396.

¶ 83    We disagree with defendant that this case is comparable to *People v. Larry*, 218 Ill. App. 3d 658 (1991), where the prosecutor egregiously asked the same improper question sustained by the trial court six times such that the trial court's attempts to shield the jury from the implication of the improper questions was insufficient. *Id*. at 662. Nor is the case similar to the extensive flagrantly improper conduct in *Aguirre* where the prosecutor suggested the defense was fabricated, repeatedly asked improper questions—one of which was designed to elicit a response in violation of an *in limine* order, and argued objectionable testimony sustained by the trial court. *Aguirre*, 291 Ill. App. 3d at 1035-36.

¶ 84    Moreover, we cannot say that the result would have been different had the offending questions not been asked (see *Hayes*, 409 Ill. App. 3d at 625) or that this line of questioning constitutes reversible error because the remarks were so prejudicial that real justice was denied or the verdict resulted from the error. See *Jackson*, 2020 IL 124112, ¶ 83.

¶ 85    Preceding the improper questioning, Grace had already testified that she and defendant had conversations during which she characterized defendant as "angry most of the time." When asked about defendant's tone, defendant's objections were sustained such that the jury never heard a response. Defendant's argument that these questions would allow the jury to insinuate that defendant was a ticking time bomb or prone to anger are without merit and ignores the other properly admitted evidence demonstrating this proposition including Grace's prior testimony that defendant was angry most of the time during their conversations as well as his actions to impede the sale of the marital residence.

¶ 86    Moreover, there was substantial evidence to support the jury's guilty finding such that the improper questioning here would not change the outcome. Video footage from ESS placed defendant at ESS at the time of the fire. He is seen going in and out of ESS as well as his storage

unit where the fire occurred. He is seen accessing the unit shortly before the smoke became visible from the unit. There was no evidence of any other persons entering the unit during that period. Upon observing the fire, defendant was seen throwing a large object into the fire causing the flames to grow larger. He was then observed throwing a second large box-like item into the fire despite his prior effort causing the flames to increase. Defendant acknowledged throwing a television into the fire contending he did so in attempt to put the fire out. However, this is incomprehensible, particularly where his previous action in throwing a large object into the fire yielded the opposite result.

¶ 87    Defendant could also be seen in the area of the electrical boxes and, at times, reaching up to one of the boxes. There was testimony from Rivera that the electrical boxes were kept locked and from both Rivera and Granadon that the boxes had been damaged and could be pulled right up after the incident.

¶ 88    At the time of the offense, defendant was going through a highly contentious divorce, where an order of protection issued and substantial intervention was required from the divorce judge to sell the marital residence and remove defendant's personal belongings due to defendant's efforts to prevent the home's sale and closing. Defendant changed the lock codes on the home and took various fixtures such as fans, thermostats, and speakers ordinarily intended to remain with the home upon sale. Defendant acknowledged he was upset with how things were handled with respect to his property. Fire Marshall Jenkins testified defendant suggested to him that Grace was responsible for the fire.

¶ 89    Jenkins also testified that the fire had been started by an open flame available to combustibles. He rejected defendant's posited theory that the fire was started by a battery. In fact, Jenkins found a damaged battery in the unit but concluded it did not start the fire.

¶ 90    Given this evidence, we do not find reversible error and, as such, defendant's second unpreserved allegation of error is not subject to plain error review under either prong of the plain error doctrine.  See *Jackson*, 2020 IL 124112, ¶ 81 (holding that a defendant fails to establish pain error where no reversible error occurred at all).

¶ 91    Defendant further argues the prosecutor's questions to defendant about his text communications with Grace were improper impeachment because the State never perfected the impeachment by introducing the text messages on which the questions were based.  The exchange was as follows:

> "State:  In fact, you were very angry with Grace Calabrese, correct?
>
> Defendant:  No, I wouldn't say that.
>
> State:  Well, you called her names, correct?
>
> Defendant:  No, that's not correct.
>
> State:  You called her a 'b***,' correct?
>
> Defendant:  That's not correct.
>
> State:  You sent her angry texts, correct?
>
> Defense Counsel:  Objection.
>
> Defendant:  That's not correct.
>
> Defense Counsel:  There's no evidence.
>
> The Court:  Well, she can ask.  He can deny it.
>
> Defense Counsel:  She can't prove it.
>
> The Court:  The objection is overruled.  He denied that."

¶ 92    The State responds arguing the defense opened the door to this line of questioning on direct examination of defendant who testified he "was not so 'disgruntled to the point where

[defendant] would burn [his] own things' " and thus, the State "followed up on defendant's cross-examination with questions about the state of defendant and Grace's relationship." The State argues this was not an attempt to impeach the defendant with prior inconsistent statements made, but cross examination with respect to defendant's motive and anger toward Grace.

¶ 93     Here we note that "It is error for a prosecutor to ask a defense witness questions presuming facts not in evidence unless the State has evidence to substantiate the questioning" due to "[t]he danger inherent in such questioning *** that the jury will ignore the denial and presume the accuracy of the impeaching insinuation contained in the question." *Aguirre*, 291 Ill. App. 3d at 1035. However, irrespective of whether error occurred with respect to the State's cross examination, as with the State's examination of Grace, we disagree this line of questioning constitutes reversable error because the remarks did not result in substantial prejudice to the defendant, such that, absent those remarks the verdict would have been different. See *Hayes*, 409, Ill. App. 3d at 625. Finding no reversible error, we conclude defendant's third unpreserved allegation of prosecutorial misconduct is not subject to plain error review under either prong of the plain error doctrine. See *Jackson*, 2020 IL 124112, ¶¶ 81, 83.

¶ 94     As discussed above, there was evidence of the Grace and defendant's contentious relationship such that the name calling, even if defendant's denials were ignored, would not tip the scale on the jury's decision in this case. This is particularly true given the other evidence including the video footage of defendant from ESS; the facts introduced concerning defendant's divorce including the existence of an order of protection and defendant's response to the sale of the marital residence and the relocation of his personal effects providing motive; Jenkins' testimony regarding the cause of the fire and excluding the battery as a source; defendant's intimation to Jenkins that the fire was started by Grace; Peraino's testimony defendant threw two

large objects into the fire causing the flames to grow larger; and testimony from Rivera and Granadon regarding the damaged electrical boxes.

¶ 95                                    Cumulative Error

¶ 96     Defendant argues the cumulative effect of his alleged errors—(1) the trial court's allowance of evidence of the existence of an order of protection and (2) the three instances of alleged prosecutorial misconduct—have the cumulative effect of denying defendant a fair trial.

¶ 97     " '[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error.' " *People v. Green*, 2017 IL App (1st) 152513, ¶ 117.  " '[T]he cumulative errors that warrant such an extreme result must themselves be extreme.' [Citation.]" *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55.  There can be no cumulative error where no error occurred at all and generally, no cumulative error will be found where alleged errors do not amount to reversible error on any individual issue or, such errors did not rise to the level of plain error.  *Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 98     As discussed above, we determined that the trial court did not err in allowing evidence of the existence of an order of protection.  We further concluded the State's comments during closing argument did not amount to prosecutorial misconduct.  Moreover, we found the remaining two errors did not constitute reversible error and given the evidence were minor if error at all, and thus, were not subject to plain-error review.  Accordingly, we cannot say a new trial is warranted on the grounds of cumulative error.

¶ 99                              Ineffective Assistance of Counsel

¶ 100   Defendant alternatively argues he received ineffective assistance of counsel due to his attorney's failure to preserve his alleged instances of prosecutorial misconduct.

¶ 101   Criminal defendants have a constitutional right to effective assistance of counsel and claims alleging ineffective counsel are governed by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (2004); *People v. Veach*, 2017 IL 120649, ¶ 29.

> " 'To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate [1] that counsel's performance was deficient and [2] that the deficient performance prejudiced the defendant.' [Citation.]  Specifically, 'a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' [Citation.]  'A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." ' [Citation.]  'A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness.' [Citation.]" *Id*. at ¶ 30.

¶ 102   "[I]f the ineffective assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not determine whether counsel's performance was constitutionally deficient." *People v. Morgan*, 187 Ill. 2d 500, 530 (1999).

¶ 103   Again, we found no error occurred at all with respect to the State's comments on defendant's return to the marital residence during closing argument and, as such, defendant's failure to object cannot be seen as insufficient performance.  See *People v. Richardson*, 189 Ill.

2d 401, 411 (2000) (to establish a claim of ineffective assistance of counsel it must be shown that counsel made errors and that those errors were serious).

¶ 104   Even if we assume defendant's remaining claims of prosecutorial misconduct were improper, defendant has not shown "that counsel's deficient performance rendered the trial result unreliable or rendered the proceeding fundamentally unfair."  See *People v. Moore*, 356 Ill. App. 3d 117, 121 (2005).  The evidence established that defendant was unhappy about the divorce proceedings in which an order of protection was obtained.  Defendant took significant steps in attempt to thwart the sale of the marital residence by changing codes to prevent access to the home and removing fixtures.  There was also evidence defendant attempted to blame Grace for the fire.  Given this evidence, any inferences the jury might have drawn from the State's questioning Grace about the tone of defendant's voice or cross-examination of defendant about his communications with Grace following the fire would be of little import.

¶ 105   Furthermore, there was substantial evidence to support the jury's guilty finding.  We again point to the video footage from ESS showing defendant accessing his unit just prior to the fire and while the fire was on-going.  The video further shows defendant tinkering with the electrical boxes on various occasions after which the box was observed to be damaged by both Rivera and Granadon.  Testimony from Peraino included his observation of defendant throwing a large box-like object onto the fire causing the flames to grow larger and, notwithstanding this reaction, throwing a second large box-like item into the fire with the same result.  Defendant's explanation that he was attempting to "smash" out the fire defies logic where, in the first instance, this action only caused the flames to grow larger.  There was evidence defendant was going through a contentious divorce based on the fact that an order of protection had entered in the case.  Defendant was clearly unhappy about the sale of his home given his attempts to

prevent the closing by changing the lock codes and removing fixtures that would be expected to remain with the home upon its sale. Defendant theorized a charging battery had caught on fire in the unit; however, Jenkins, opined that this was not the case. Instead, Jenkins concluded the fire was ignited by an open flame available to combustibles such as plastics and cardboard in the middle of the storage unit. This evidence persuades us the jury's conclusion would have been the same regardless of any deficient performance by counsel. Accordingly, we reject defendant's argument that he received ineffective assistance of counsel.

¶ 106                    One-Act, One-Crime Doctrine

¶ 107   Defendant argues "the jury heard no evidence of damage to a door, or to items and systems attached to a door, that was not caused by the fire" and thus pursuant to the one-act, one-crime doctrine, he cannot be found guilty of both arson and criminal damage to property because "both counts were based upon the same physical act—starting the fire."

¶ 108   Defendant acknowledges that this issue was not properly preserved for appeal but argues "it may be reviewed under the second prong of the plain-error doctrine because a violation of the one-act, one-crime rule affects [defendant's] substantial rights." We agree. See *People v. Coats*, 2018 IL 121926, ¶ 10 (stating our supreme court "has previously explained that one-act, one-crime violations fall within the second prong of plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process.").

¶ 109   "Under [the one-act, one-crime] rule, a defendant may not be convicted of multiple offenses based on the same physical act. *** For purposes of this rule, an 'act' is defined as any overt or outward manifestation that will support a separate conviction." *Almond*, 2015 IL 113817, ¶ 47.

> "[T]he one-act, one-crime doctrine involves a two-step analysis. [Citation.]  First, the court must determine whether the defendant's conduct involved multiple acts or a single act.  Multiple convictions are improper if they are based on precisely the same physical act.  Second, if the conduct involved multiple acts, the court must determine whether any of the offenses are lesser-included offenses.  If an offense is a lesser-included offense, multiple convictions are improper.  [Citation.]" *People v. Miller*, 238 Ill. 2d 161, 165 (2010).

¶ 110    While the one-act, one-crime rule requires a two-step analysis, on appeal defendant only argues "the convictions for arson and criminal damage to property were both based upon damages caused by the fire, such that only the conviction for arson may stand."

¶ 111    We disagree with defendant.  We find that his conviction for arson and criminal damage to property were based on two separate and distinct acts: (1) damaging the electrical box and (2) starting the fire.  See *Miller*, 238 Ill. 2d at 165.

¶ 112    At trial, defendant acknowledged accessing the smaller electrical box to open the garage. He also acknowledged being in the vicinity of the electrical boxes while inside ESS.  ESS surveillance footage showed defendant approach the electrical box, walk back toward the pedestrian door, pull something from his pocket and approach the electrical box again.

¶ 113    Rivera testified that inside ESS there were two electrical boxes on the south wall next to the entrance door.  The larger of the boxes contained only wires while the smaller box contained a button which opened the exit garage.  We believe the location of these boxes is consistent with the charge against defendant alleging damage to an entrance door and various attached items and systems.

¶ 114   Later in the surveillance video defendant is again visible in the area near the electrical boxes and can be seen sometimes reaching up to one of the boxes.  Rivera testified that both boxes were kept locked.  Rivera testified he inspected the electrical boxes after the incident which he described as appearing "damaged and broken into.  *** One of the locks was actually broken."  This was corroborated by Granadon who also looked at the electrical boxes after the incident and noted "there were two metal boxes on the wall ***, which were control boxes to control the overhead door, and the doors to access them had been, in my opinion, pried open *** you could pull them right up."  Three photographs of the damaged electrical boxes were also introduced into evidence.

¶ 115   Defendant's storage unit, where the fire occurred, could only be accessed from outside ESS.  Thus, no access to the two electrical boxes located inside ESS was required for the fire to be started in the storage unit.  Further, there was no evidence that the damage from the fire extended into ESS where the electrical boxes were located.

¶ 116   Accordingly, we conclude that two separate acts clearly took place here—the arson, wherein, debris in his storage unit was set on fire causing damage to the interior and exterior of the unit and adjoining units and a second separate act wherein defendant entered ESS, accessed the electrical boxes and caused damage to the boxes.  The separate act was described by the State in closing argument as follows:

> "[Defendant] damaged the inside of Extra Space Storage as well, the control boxes.  He went in, popped open the control boxes, broke their seals, and then manipulated the wires inside and overrode the locking mechanism allowing him to open and close the garage to let himself in and to let himself out."

¶ 117   As noted above, defendant does not address the second step of the one-act, one-crime analysis.  See *Miller*, 238 Ill. 2d at 166.  Pursuant to Illinois Supreme Court Rule 341(h)(7), a party's failure to argue a point in his or her brief results in forfeiture of that issue on appeal.  Ill. S. Ct. R. 431(h)(7) (eff. May 25, 2018); see also *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 59 (declining to address the defendant's one-act, one-crime argument where he failed to properly preserve the argument for appeal and further failed to address one of the steps in the two-step analysis under the one-act, one-crime doctrine).  Accordingly, we find no violation of the one-act, one crime doctrine.

¶ 118                                Reduction of Class 4 Felony Conviction

¶ 119   The parties agree, as does this court, that defendant's Class 4 felony criminal damage to property conviction should be reduced to a Class A misdemeanor criminal damage to property conviction where the state failed to prove damages exceeding $300 were caused to the electrical boxes.

¶ 120   Supreme Court Rule 615(b)(3) permits a reviewing court to reduce the degree of the offense for which the appellant was convicted.  Ill. S. Ct. R. 615(b)(3) (eff. Jan. 1, 1967).  This authority may be exercised when the evidence fails to prove beyond a reasonable doubt an element of the greater offense.  See *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).

¶ 121   Section 5/21-1(d)(1)(C) of the Criminal Code of 1961 (Code) states that for the offense of criminal damage to property to constitute a Class 4 felony, the value of the property damaged must exceed $300 and not exceed $10,000 in value.  720 ILCS 5/21-1(d)(1)(C) (West 2014).  Pursuant to section 5/21-1(d)(1)(B) of the Code, where the value of the property damaged does not exceed $300, the offense is considered a Class A misdemeanor.  720 ILCS 5/21-1(d)(1)(B) (West 2014).  The State failed to prove damages exceeding $300 and, as such, we reduce

defendant's conviction for criminal damage to property from a Class 4 felony to a Class A misdemeanor.

¶ 122                 CONCLUSION

¶ 123    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed with the exception that defendant's conviction for criminal damage to property is reduced from a Class 4 felony to a Class A misdemeanor.

¶ 124    Affirmed as modified.